## ATLANTIC RICHFIELD COMPANY, Plaintiff,

v.

## INTERSTATE OIL TRANSPORT COMPANY, Defendant.

### No. 78 Civ. 1054 (VLB).

United States District Court,
S. D. New York.

Jan. 9, 1981.

Haight, Gardner, Poor & Havens, New York City, N. Y., for plaintiff.

Bigham, Englar, Jones & Houston, New York City, N. Y., for defendant.

MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

This is an indemnity action arising under the admiralty and maritime jurisdiction of this court. *See* 28 U.S.C. § 1333. Plaintiff Atlantic Richfield Company sues defendant Interstate Oil Transport Company to recover money damages that plaintiff previously paid by way of settlement to General American Transportation Company ("American"). The relevant facts are set forth in my memorandum order dated April 16, 1979 denying defendant's original motion to dismiss the complaint or, alternatively, for summary judgment.

The case is presently before me on defendant's renewed motion for an order dismissing the amended complaint on the ground that plaintiff has failed to state a claim upon which relief can be granted, or, in the alternative, for an order granting summary judgment. *See* Rules 12(b)(6); 56, Fed.R.Civ.P. Rule 12(b), Fed.R.Civ.P., provides that where, as here, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment. For the reasons set forth below, defendant's motion is denied.

### II.

Underlying this action is an explosion which occurred while the barge TB Ocean 80 was at dockside space leased by plaintiff from American pursuant to a written lease agreement. Plaintiff was the time charterer of the barge, and defendant was the bareboat charterer.

Plaintiff's amended complaint, filed July 16, 1979, sets forth two grounds on which

plaintiff may have been liable to American, and plaintiff asserts that with respect to each it is entitled to indemnification from defendant. First, plaintiff asserts that it may have been liable to American under the general maritime law because of the unseaworthiness of the barge or the negligence of her crew. Second, plaintiff asserts that it may have been liable to American for the unseaworthiness of the barge or the negligence of her crew under the terms of the lease agreement between plaintiff and American.[1] The amended complaint alleges that on the basis of these two grounds of potential liability a reasonable settlement between plaintiff and American was effected, for the payment of which plaintiff is entitled to indemnification from defendant.

Defendant advances two theories in support of summary judgment. First, defendant contends that under the general maritime law a time charterer assumes no liability to third parties for the unseaworthiness of a vessel or the negligence of her crew, unless the parties intend otherwise, and that here the parties did not intend otherwise. Second, defendant contends that plaintiff could have incurred no liability to American which affected defendant because such liability would have required, as a premise, defendant's liability to American, and the possibility of such liability had been extinguished prior to plaintiff's settlement with American, in a settlement effected between defendant and American in December, 1976. Thus, defendant asserts, plaintiff is not entitled to indemnification from defendant.

### III.

■ Defendant's first theory was rejected on defendant's original motion because, on the then existing state of the record, the question whether the parties to the time charter intended plaintiff to be liable to third parties presented a genuine issue of material fact. In its renewed motion, defendant offers the deposition testimony of Bruce H. Hooper, vice president of defendant, and of Herbert J. Russell, the claims manager of plaintiff's insurance division, in support of the contention that the parties did not intend plaintiff to be liable to third parties for unseaworthiness or crew negligence.[2]

Hooper's testimony establishes that the matter of plaintiff's liability to third parties was not discussed during the negotiations with respect to the time chartering of the barge; that a provision for such liability had never been provided for in any other charters between plaintiff and defendant; and that had such a provision been contemplated, Hooper would have been made aware of it because of its unusualness. Hooper conceded, however, that dealings between plaintiff and defendant had been underway before he came on the scene, that all implicit terms of charter parties were not renegotiated each time a barge was chartered, and that the matter of who, as between plaintiff and defendant, would be liable in the case of the unseaworthiness of a chartered barge or the negligence of her crew would depend largely on the course of dealings between the parties. Hooper was aware of plaintiff's lease agreement with American but did not know its terms.

Russell testified to a pattern of dealing between the parties in the handling of claims involving either the unseaworthiness of chartered barges or the negligence of

---

1. Paragraph 7 of the lease agreement between Atlantic as lessee and American as lessor provided, in relevant part:

   Lessee shall exonerate, indemnify and save harmless Lessor from and against any liability for damage of the property of Lessee, Lessor or others, liability for injury (including death) to persons (including employees of Lessor) and all claims or actions in connection with such damage, based upon, arising out of or occurring in connection with the deposit or withdrawal of Lessee's materials, except such claims as arise out of Lessor's failure to use reasonable care in the safe-keeping and handling of the Lessee's commodities or property.

2. Hooper was directly involved in the negotiations with Atlantic for the T/B Ocean 80. Russell was not involved in the negotiations, but had worked in Atlantic's Marine Division and its predecessor from 1948 to 1960, had assisted in the chartering of barges from, among others, Interstate, and had, during his subsequent years in Atlantic's Insurance Division, handled claims on behalf of Atlantic arising out of the employment of barges chartered from Interstate.

their crews. If plaintiff became liable to a third party under the terms of a written contract, such as the lease agreement between plaintiff and American, and liability resulted from unseaworthiness or crew negligence, plaintiff would satisfy the liability to the third party in the first instance and look to be reimbursed by the defendant or its insurer.[3]

Regarding intent, Hooper's testimony is neutral. The absence of the subject from negotiations for the charter of the T/B Ocean 80 or other barges is no indication, one way or the other, of the intent of the parties. To contend that such absence is evidence of a lack of intent requires the drawing of an inference consonant with traditional principles of admiralty law but inadequate as a basis for summary judgment. Russell's testimony concerning the pattern of dealing between the parties, on the other hand, is not neutral regarding intent: it sufficiently manifests the intent of the parties to alter the traditional allocation of liability to indicate the existence of a genuine issue of material fact, and thus to make summary judgment in favor of defendant inappropriate. *See Camiolo v. Felicitas-Rickmers Line K.G. & Co.*, 449 F.Supp. 18, 20 (S.D.N.Y.1978).[4]

## IV.

■ Defendant's second theory in support of summary judgment addresses plaintiff's potential liability to American. Defendant contends that as of the time of the settlement of plaintiff's cargo action against American, resulting in plaintiff's payment of $500,000 to American on American's counterclaims, any duty that defendant might once have owed to American had long since been extinguished by the December, 1976 settlement between American and defendant. Defendant argues that because plaintiff's asserted right to recover against defendant derives from a potential right of American to recover against defendant, the elimination by settlement of American's right to recover against defendant warrants dismissal here as a matter of law.

■ Under paragraph 7 of the lease agreement between plaintiff and American,[5] plaintiff undertook what was in the nature of an insurer's liability to American to the extent that plaintiff agreed to "exonerate, indemnify and save harmless" American against any damage to its or others' property arising from circumstances such as those here alleged. *See* N.Y. Ins. Law §§ 4(22), 41(1).[6] Having undertaken what was in the nature of an insurer's liability, upon a loss plaintiff, to the extent it paid on the loss, in normal course would be subrogated *pro tanto* to the rights of its insured against a third party whose negligence or wrongful act occasioned the loss.[7]

3. While Interstate was the bareboat charterer of T/B Ocean 80 and not its owner, *vis-a-vis* the time charterer, Atlantic, Interstate stood in the shoes of, and had the liabilities of, the owner. *See United States v. Shea*, 152 U.S. 178, 186–88, 14 S.Ct. 519, 521, 38 L.Ed. 403 (1894).

4. The manifestation of the intent to shift liability appears most clearly when expressed in the terms of a written charter party, *cf. Camiolo*, 449 F.Supp. 18 (clause of written time charter required charterer to load, stow, trim, and discharge cargo at its expense), but defendant has pointed to no authority, and I am aware of none, suggesting that the intent may not also be manifested in a pattern of dealing between the parties.

5. *See* note 1, *supra.*

6. The term "insurance contract" as it pertains to the business of insurance is defined in the New York Insurance Law as "any agreement or other transaction whereby one party, herein called the insurer, is obligated to confer benefit of pecuniary value upon another party, herein called the insured or the beneficiary, dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event." N.Y. Ins. Law, § 41(1).

7. An insurer's equitable right of subrogation requires payment of a debt for which another is primarily responsible. *See generally,* 44 Am. Jur.2d, *Insurance* § 1820, at 745–46 & n.16 (1969); 73 Am.Jur.2d, *Subrogation* § 26 (1974). Plaintiff made such a payment pursuant to the judgment order of this court entered on the record on December 1, 1977 by Judge Conner. The order was entered in plaintiff's cargo action against American, in which action American asserted counterclaims seeking $5 million for damages to its property and for indemnification for any sums paid by American to third parties as a result of the explosion of the T/B

An insurer, however, acquires no right of subrogation until it pays the loss, and where a third-party tortfeasor is effectively released from liability by a settlement between the insured and the tortfeasor entered into before an insurer's payment of the loss, the settlement and release bar the insurer's right of recovery from the tortfeasor, in the absence of fraud or collusion against the insurer. Where, however, the instrument of release running from the insured to the tortfeasor provides that the settlement is not intended to discharge the insurer from any claim that the insured might have against it, and the instrument of release is given after receipt of payment covering only part of the loss, the insurer's right of subrogation against the tortfeasor is not barred to the extent that the amount paid did not cover the loss. Particularly is this so where, as in this case, the settlement between the insured and the tortfeasor contemplates that the insured will thereafter pursue its claims with respect to the loss against the insurer. *Connecticut Fire Ins. Co. v. Erie Ry.*, 73 N.Y. 399 (1878).[8]

In the December, 1976 settlement between defendant and American, defendant and its affiliate Ocean 80 Company were released from all liability under claims by American or its carrier[9] for damages to

Ocean 80. Judge Conner's order dismissed Atlantic's claim and granted judgment to American on its counterclaims in the amount of $500,000. The order recited that "it appears that [Atlantic] may be responsible to [American] for any negligence on the part of Interstate Oil Transport Company, Ocean 80 Company or employees thereof, even without any other showing of negligence on the part of [Atlantic]." Judgment Order, *Atlantic Richfield Corp. v. General American Transp. Corp.*, 74 Civ. 4089, transcript at p. 3 (S.D.N.Y. Dec. 1, 1977). It is for payment of this judgment that plaintiff here seeks indemnification against Interstate.

8. In *Connecticut Fire Insurance*, an insurance company insured certain property of one John Martin against fire. The property was destroyed in a fire resulting from the negligence of a railroad, and the insurer paid on the loss after Martin had released the railroad from "all" liability. The railroad, like the defendant here, challenged the insurer's subrogation action on the ground that the settlement and release extinguished the insurer's claim.

The release in the *Connecticut Fire Insurance* case provided as follows:

Loss and damage.
Erie Railway Company,
To JOHN MARTIN,
Salisbury Mills, Dr.

For settlement in full of all claims, demands and causes of action against the Erie Railway Company for loss and damage by fire, claimed to have been caused by sparks or coals from engine, burning hotel building, barn, shed and contents, fences, trees, etc., at Salisbury station, on or about May 13th, 1773 [sic] ... $2,100.

This settlement is not intended to discharge the Connecticut Fire Insurance Company from any claim which said Martin has against them for insurance, but as a full settlement with, and discharge of, the Erie Railway Company only.

Received, September 10, 1873, of the Erie Railway Company, through the hands of R. L. Brundage, claim agent, two thousand one hundred dollars, in full of the above amount.

$2,100.                    JOHN MARTIN.

73 N.Y. at 403. Since the consideration for the release was considerably less than the value of the destroyed property, the court concluded that Martin had not received the full amount of the damages incurred. In view of this circumstance, the paragraph of the release indicating that the insurer was not to be discharged from liability on the policy was intended to prevent the insurer from interposing the settlement as a defense to Martin's action on the policy. As to the insurer, therefore, it was as if no release had been given, and to the extent that it remained liable for the loss under the policy, the insurer's right of subrogation remained intact:

The substance of the transaction was that [Martin], having a claim against the [insurer] for $1,500, settled with and released the [railroad] from liability for the balance, retaining the claim against the [insurer]. The form of the clause is not very specific, but looking at the substance[,] it was a proviso that the release should not operate to prevent a recovery upon the policy against the [insurer]. With such a proviso, other portions of the release would have to yield to enable the proviso to have effect, and as to the [insurer] it would be the same as though no release had been given. It follows that the [insurer] could not have interposed the release as a defense in an action by [Martin] upon the policy, and if not, the logical sequence is that the right of subrogation enures against the [railroad].

73 N.Y. at 404.

9. The insurer here referred to is the Aetna Insurance Company, not plaintiff.

American's facilities arising out of the explosion of the barge. The claims and counterclaims of American and defendant in the then pending limitation of liability proceeding were to be discontinued. The consideration for the release was defendant's payment to American of $1 million and a promise to pay additional amounts should American be required to pay more than was expected in settlement of the claims of third parties.[10]

The settlement specifically provided that (1) plaintiff's claim against defendant and Ocean 80 Company in the limitation proceeding, (2) plaintiff's separate cargo action against American, and (3) the counterclaims of American against plaintiff, which had been asserted in the separate cargo action, were to "continue in litigation." In the event that plaintiff recovered from defendant or Ocean 80 Company in the limitation proceeding, American agreed to indemnify defendant and Ocean 80 Company for whatever sums were due plaintiff for its cargo loss. It was further agreed that defendant and Ocean 80 Company would lend their full cooperation to American, both in the limitation proceeding and in separate actions, in the defense of all claims against American arising from the explosion.

American's counterclaims in the cargo action against plaintiff, which amounted to $5 million, were eventually reduced to the judgment of $500,000 for which plaintiff here seeks indemnification, and these counterclaims can be presumed to have been based in large part on the insurer liability undertaken by plaintiff in its lease agreement with American. The counterclaims had been first served on plaintiff more than two years prior to the settlement between American and defendant,[11] and thus at the time of that settlement American could hardly have been unaware of its potential right of recovery from plaintiff under the lease agreement. Indeed, such awareness was acknowledged in the provision of the settlement between defendant and American that provided for the counterclaims to "continue in litigation."

The continuing counterclaims for American's damages and indemnification amounted to $5 million: the consideration paid by defendant and Ocean 80 Company for their release from "all" liability was considerably less. Put starkly, the insured (American) settled with the tortfeasor (defendant), with the specific understanding on the part of both that the amount paid in settlement was less than the loss, and that the insured retained the right to recoup the balance of the loss from the insurer (plaintiff).

The impact of the settlement between defendant and American was to prevent plaintiff from interposing the settlement as a defense to American's counterclaims in the cargo action. To the extent that the settlement amount did not compensate American in full for its damages, the language of the settlement preserved American's right to recover against plaintiff, on its counterclaims, for the balance. As to plaintiff it is as though there were no settlement between American and defendant. Defendant's settlement with American could not, therefore, extinguish plaintiff's claims against defendant. "[T]he assured [American] released only such damages as [it] could without interfering with [its] claim against the [plaintiff], and the legal

---

10. The settlement recited that American had already paid $900,000 in settlement of some third-party claims and that it might be obligated to pay another $350,000 in settlement of others. Though it is left unclear whether the entire $350,000 amount would be paid by American, the settlement states that any amounts in excess of this amount, up to $125,-000, would be paid by Interstate and Ocean 80 Company. Any amounts required to be paid in excess of that total, $475,000, were to be paid by American. Assuming that American were required to pay the entire $350,000 amount, but

that the total of settlement payments to third parties did not exceed $475,000, American would have been left, in sum, with a liability of $250,000.

11. The original answer in the cargo action, containing American's counterclaims seeking $5 million for damage to American's property and indemnification for any sums paid by American to third parties, was served on Atlantic on December 2, 1974. An amended answer containing the same counterclaims was served on March 31, 1975.

consequences must be regarded as a part of the exception, viz., the right of the [plaintiff] to a remedy over." *Connecticut Fire Ins. Co., v. Erie Ry., supra*, 73 N.Y. 405.

Thus, plaintiff's claim against defendant for indemnification with respect to amounts paid to American subsists. The question of whether defendant is in fact liable will be an issue at trial. (See Section III, *supra*).

## V.

By letter to chambers dated February 15, 1980, plaintiff's counsel requested that the third cause of action of plaintiff's amended complaint be deleted. This request is granted. So ordered.